Good morning, Your Honors. May it please the Court. Brian Pease, representing United Poultry Concerns, plaintiff and appellant. Do you want me to begin? Please, go for it. Thank you. The Church of Scientology has a spiritual ritual called auditing, which requires individuals to sit with a church official. I'm sorry. I think we reduced the time to 10 minutes in this case. Did you get the notice on that? I did. I did. OK. We reduced the time to 10 minutes for each side. Sorry about that. I just wanted to. OK, sorry. Thank you, Honor. That's all right. So Hernandez Court discusses this thing in the Church of Scientology, which an individual sits down with a church official and uses something called an e-meter. And it's not tailored to the specific individual. They have certain questions and answers. And the e-meter tells them if they've reached certain levels of spiritual analysis. And they pay money to engage in this specific act. In Hernandez, the issue was, do the payments made to the Church of Scientology constitute, is that a charitable donation that could be written off for tax purposes, or is it not? And the key determining factor in that case in Hernandez was the fact that there was a quid pro quo expectation there. The person making the payment expected to receive something in return. That's also the key fact that differentiates the payments or donations that are made in the case at Bar from ordinary. Is this going to your point about it being a business practice? It is, Your Honor. That's the one basis on which the district court ruled against us. What about Article III standing? How do you have? I know the district court found in your favor on that. But how have you established Article III standing? The district court did rule in our favor on that. And we would submit as well that the standing under the unfair competition law is even more stringent than Article III standing. Because you have to have under a couple of. But how have you satisfied Article III standing? Through, Your Honor, diversion of organizational resources. And the fact. How did that affect your mission? You have to show what affected your mission. I think you define your mission as education and advocacy against the practice. Correct. And the Napa Partners case addresses this. The key determining criteria is whether resources were expended and the mission was diverted. How was your mission diverted? If your mission is advocacy, how was that mission affected by what the Shabbat was doing in this case? By engaging in specific illegal acts, by performing the Kippurit ritual in an illegal manner, United Poultry Concerns, which seeks to educate all practitioners of Kippurit and inform them that there are other ways to perform this ritual without killing chickens, whether it's done legally or not. The fact that they're doing it doesn't stop you from telling people not to do it, which is your mission. It's the fact that they're doing it illegally that United Poultry Concerns either has to choose between having more entities that are doing this so their resources are spread more thin because they have more entities that are engaging in this activity, even though this specific entity and other entities are doing it in an illegal manner. If they were not doing it in an illegal manner, that would be less entities that United Poultry Concerns would then need to spread their resources around trying I'm not sure I understand that. Because at the time that United Poultry, I guess, drafted its mission or was conducting its mission, was it already aware that defendants used chickens as part of this ritual? Well, United Poultry Concerns has been working on this issue for decades. So they were not aware of these particular defendants. And they're based on the East Coast. It's a diversity case. So they probably only became aware of this particular defendant in the past few years. But upon, go ahead. So learned about it within the last two years. Is that right? Oh, I said few years. But it would have been more than two years because this case was filed. It was based on acts that occurred as long ago as 2014. So it was in the past several years, let's say, that they'd learned of this.  Ms. Stenow, Ronny Stenow. Spent a few hours confirming what you all had already seemed to be aware of, that the defendants were still using chickens as part of its process. She called defendants and was, I guess, physically present during the ritual. I'm just trying to figure out how this was a diversion of resources that was frustrating United Poultry's mission. Right, and it wasn't just finding out that they were using chickens. Ms. Stenow actually expended a great deal of time interacting with various officials, particularly when the defendants in this case were making the claim, and maybe they were, that they were giving these carcasses to the poor, to food banks, which is completely illegal because they're unrefrigerated. It's not done at a USDA licensed slaughterhouse, which is another big issue in this case. How was your mission affected? Because instead of dealing with acts that are being done legally, she's now spending time, money, and resources. And it doesn't have to be a lot. Kwikset establishes that even the most trifle of an injury, as long as there is economic injury, suffices. And then the Napa Partners case, which this is directly analogous to, that was a case where Animal Legal Defense Fund hired an investigator to go to a restaurant that was illegally selling foie gras in violation of California's ban on foie gras. And they were doing it by selling an expensive salad. They came with this free, they called it, a free side, but it was actually a sale. And by hiring this investigator to have to go and expose that this was happening. Is that what was happening? Because it seems that United Poultry knew about the defendant's practices at the time of your mission. And if I recall correctly, United Poultry had, as part of its mission, a goal to convince the defendants to use coins rather than chickens for this ceremony. So I'm not quite sure how that was a diversion of your resources. United Poultry Concerns would certainly prefer that defendants, as well as other entities engaging in copart, use coins rather than chickens. But short of that, there are a number of things that can be done, such as following basic animal cruelty, environmental, and public health and sanitation laws. And one of the things that Ms. Steinow investigated and was corresponding with California Food and Ag officials about was the fact that, are they, in fact, giving these chickens to food banks because that's illegal, and determining exactly what they're doing? When she finds out that, well, now, because they can't give them to a food bank, they're going to throw them in the trash or dispose of them, that is the specific act that we contend makes this mass slaughter in a parking lot illegal. If that was done for a secular purpose or without it, we don't even have to look at the religion. You can't kill an animal for the purpose of disposing of the animal unless there's a specific law allowing it. It seemed like your main argument was that Ms. Steinow was diverted somehow from the normal mission to expose this. But she didn't expose anything here. It was already, you were already aware of it. We were not aware of what they were doing with it. We were aware they were using chickens. We were not aware of what they were doing with the chickens. At the time that Ms. Steinow got involved, they were saying that they were giving them to a food bank. Food and ag official came in and said, you can't do that. Made sure that they weren't going to do that. But we didn't know where these carcasses went. And then she determined by spending time and resources that the way that they're doing it, by doing it at this parking lot, which is not a clearly USDA licensed slaughterhouse, is they're simply disposing of the chickens. So that's something, we shouldn't even have to be there. When I say we, I mean United Poultry Conservancy. They shouldn't even have to be dealing with this, a mass illegal slaughter of chickens in a parking lot. Their mission is to protect, to promote humane treatment of animals, and convince people to respect animals. So the fact that they're not having to deal with these illegal acts, this fits directly under the Napa case, where it's to counteract the effects of the defendant's alleged misconduct. As long as it's not done in anticipation of litigation, that satisfies UCL standing. But you knew they were killing the chickens. Right. So that seemed like that was your mission. But if they were doing it legally, then there's nothing else. There are no resources being diverted or expended dealing with an illegal act. But it's the fact that it's being done illegally, in our view, that there is that diversion of resources. But the fact that they are killing and disposing of chickens in a parking lot is what makes it not only illegal, but also a diversion of an organization's resources, whose whole mission is to be out there educating people that are killing chickens and saying, hey, you can use coins instead, or you can treat the animals more humanely, and on and on. They shouldn't even have to be there at this particular parking lot, which is not set up to legally kill chickens. You can't give them to a food bank. That's illegal. You can't just hide them. That makes the act illegal. You should go to a licensed slaughterhouse like they did in 2016, and the animals can be used for food. Do you want to reserve any of your time? I would love to, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Matthew Martins for the defendants, the Chabad of Irvine and Rabbi Alter Tenenbaum. My clients want one thing, and that is to participate in their religion, and in particular, a centuries-old Jewish ritual in peace. And yet for more than two years and three holiday seasons, they've been harassed by a purported pro-chicken, not-for-profit organization from Maryland that is somehow claiming that it is not only gravely concerned, but supposedly injured by this practice. They belittle the practice as fringe and not mainstream, and then they attempt to use the machinery of the courts to end a religious practice that's performed by a religious minority that has survived centuries of persecution. The Court ruled on the merits below that the statute at issue, California's unfair competition law, cannot be twisted into a tool of religious regulation. Religion is not competition, and the kappa rite ritual is not a business act, and we believe that that ruling was correct, that there's no need to distort the UCL to allow this action. The state of California, which has jurisdiction to pursue any acts of animal cruelty if they think they occurred, has declined to take action here, because my clients have done nothing wrong. Do plaintiffs have Article III standing? I know you say that they don't have standing or can't make out a UCL claim, but do you concede that they have Article III standing? They absolutely do not have Article III standing. The reason they don't have Article III standing is because of what this court said in La Asasiason, the decision in 2010, that for an organization to sue on its own behalf and to have standing, it has to show both a diversion of resources and a frustration of its mission. And the court goes on to say that you can't manufacture injury by injecting yourself into a situation that doesn't otherwise affect you. And so the courts have often pointed to the Supreme Court's decision, for example, in Havens Realty. In Havens Realty, the plaintiff was left with two situations, either of which would result in harm. So in Havens Realty, if the plaintiff injected itself into the situation and sued or attacked the racial discrimination, they would have to spend money and thus suffer harm. Alternatively, if they didn't pursue litigation to try to stop the racial discrimination and just stuck to counseling, which is what they did, the counseling would be made more difficult by the racial discrimination. So they were left with two instances, either of which would result in harm. They couldn't pick one or the other without being harmed. That's not true here. The plaintiff could stick to their mission, which is educating and advocating for what they believe is the right treatment of animals, and they will suffer no harm whatsoever. The only claimed harm here, the only claimed diversion of resources, is that an organization from Maryland has decided to inject itself into the activities in Orange County, California, that would otherwise not affect it. And that's why it doesn't have standing, because it's not an issue of whether they diverted resources. The courts are clear, diverting resources to pursue something that is not otherwise affecting you does not give rise to Article III standing. In fact, that's exactly what this court said in La Asasiason. It cannot manufacture injury by incurring litigation costs or simply choosing to spend money fixing a problem that would not otherwise affect the organization. The court went on to say, plaintiff must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem. And that's why the Havens Realty case from the Supreme Court, another option resulted in harm, injury to them. If they tried to deal with the problem by suing, they would lose money. If they chose not to deal with the problem, their counseling became more difficult, the court said, because they would have to figure out how to work around the racial discrimination to counsel people about housing. It directly affected their mission. There's no such allegation here. There's lots of arguments thrown out and things stuffed into the record. But what La Asasiason also says is that you can't come after the fact and throw declarations or arguments. You have to have it in the complaint. And they have nothing in the complaint alleging that had they not chosen to send out this investigator and inject themselves into something in Orange County, California that had nothing to do with them in Maryland, if they had stuck with their mission, there's no allegation that this activity would have had any effect whatsoever on them. And that's what they have to allege for Article 3 states. Counsel, I have a question for you. Certainly, Your Honor. So my understanding is that your client is Chabad of Irvine. My question is, is United Poultry challenging similar practices of this ritual at other locations that Chabad has elsewhere at other campuses? So I am not aware of any challenge of this activity by Chabad at any other campus other than Irvine. I'm not aware of that. If that's true, I'm unaware of that. And it's certainly not alleged in this case that they're challenged at other campuses. I'm not even aware that the Chabad of Irvine has any other campuses. But let's say, aren't there Chabad organizations at different universities? There are certainly other Chabad organizations around the country. It's my understanding, Your Honor. Are they all separate corporations? I don't know the answer to that, whether they are or not. I don't believe there's any alleged in it. I don't believe there's an allegation in the complaint. I don't believe there's any evidence in the record of them being the same organization nationwide. OK, thank you. So I believe that there's a fundamental flaw in the Article 3 standing argument that the plaintiffs make, that they have not alleged that had they chosen not to inject themselves into the situation, that there would have been any effect on their activities. There's a lot of discussion about the Napa Partners case. That's a state court case that has nothing to do with Article 3 standing. It's a UCL, it's a question of UCL standing. There's also a UCL standing problem here, we believe. Because, and it was interesting, just in the oral argument prior to this case, plaintiffs counsel made the point, which is, of course, well established that under Prop 64, you only have standing as a plaintiff if you are someone who was transacting with the defendant. That, in fact, that the Kwikset case, the California Supreme Court case, says that Prop 64 requires that you be somebody who had, quote, business dealings with the defendant. There's no allegation of that here. There's no allegation that plaintiffs participated in, or purchased, or in any way had any business dealings with my client. And so they also have a significant UCL standing problem, assuming the court gets to that. But as the court knows, the Article 3 jurisdictional issue has to be resolved first. We also believe that the court below rightly decided the question of whether or not the UCL even touches this type of conduct. That what the UCL prohibits by its terms in Section 17203 is, quote, unfair competition. And Section 17200 defines unfair competition as any unlawful, unfair, or fraudulent business act or practice. That this is a statute about commerce. It's a statute about business acts. It's a statute about commercial activities. And what the court below rightly concluded is that a religious activity, a religious ritual, is not a business activity. Well, is the selling of chickens, though, a business activity? They tried to separate that out from the religious ritual and say they're selling chickens. When it was enjoined for a while, it was done in a parking lot of a store. And because of that, they view it as a business practice. So they certainly do, in their brief on appeal, try to separate out the various aspects of the ritual. What I would point the court to is what they say in the complaint, which is in paragraphs 11 and 35. They allege the ritual killing is what they're challenging. In fact, the only thing that the statute at issue, the animal cruelty statute, addresses, and so the only thing that could be challenging, is the killing of the animals. Now, to the extent that there's money exchanged in connection with that religious ritual, I would say that that, in fact, is true of every religious ritual to a varying degree of directness. In other words, religious rituals cost money to conduct. Whether that's communion at a church, or whether that's any number of other types of rituals that various religions engage in, there's always some money. Not every religion is as direct as, please make a contribution of x amount in order to engage in this particular ritual. But all of those religious institutions operate based on funds, and there's funds delivered at some point by the participants or the organization wouldn't continue. And so I think the fact that, in this instance, the money is more directly connected doesn't change the fact that what they're doing is using a statute that's about business acts to challenge not the money, because the statute doesn't prohibit the money. The animal cruelty statute deals with the killing of the chickens, which the complaint alleges repeatedly is a ritual, a religious act, in which the participants believe they are transferring their sins, and that the animal is then killed as atonement for those sins. That's what they're attacking, and that is a religious activity that should not be, the statute should not be stretched to pull that core religious activity, as the complaint alleges, into the definition of a business act. I see that I'm out of time. If the court has any other questions. The counsel, just to clarify one thing. Certainly. If, in fact, there's no Article III standing, then am I correct that we shouldn't reach and could not reach the issue of business practice under the UCL? So it is certainly, as I understand the law, that if the court does not have Article III standing, the court may not reach the merits of the case. Obviously, it would be in my client's interest to have the merits addressed once and for all, but I do believe that Article III standing is a prerequisite in order for the court to have jurisdiction to decide that issue. Thank you, Your Honor. Very briefly, Kwikset did not require that you have to have a commercial transaction with the other party in order for there to be UCL standing. In fact, it gives a very good analysis about how you do not have to have that commercial transaction. You do not have to have even restitution required. You just have to have been required to have lost money or property somehow, and it goes into a very detailed analysis. How does your client lose money or property? You agree you had no business dealings with the SHVAC, right? This is rooted in federal law, Your Honor, and Kwikset cites Havens, which the organization Havens, this is organizational standing. The organization Havens injected itself. They chose to inject themselves into people that were trying to find housing, low-income individuals trying to find housing, and there was racial discrimination. They chose that as their mission. Then they could choose, well, do we sue the folks that are engaging in racial discrimination? So your business dealings is what, suing them? That's the one thing that you cannot have as a basis for standing is preparation for litigation. But the advocacy and the fact and exposing and working with officials and trying to stop the illegal acts, that's what United Poultry Concerns has done and is doing. So it's the money you expended on that. Correct, on Ms. Steinall's expenses and as well as payments to her as an independent contractor or employee. For the work she did trying to stop the practice. Exactly. The work she did trying to stop the practice, and that work was diverted by the illegal acts of defendants. That is organizational standing to a T. It's rooted in federal law, starting with Havens. La Asociación had two organizational plaintiffs. One did plead organizational standing. The other just didn't plead it. And the court said, look, you didn't plead organizational standing. You didn't say your resources were diverted. Had you said that in your complaint, you might have had standing. That's different than here, where we did plead organizational standing. And we pleaded exactly the way that was done in Napa Partners, and it is rooted in federal law. And quick, that gives a very good discussion about how if you have UCL standing, you do have Article III standing. Article III standing doesn't necessarily require economic injury. You can have aesthetic injury. You can have other types of injury to have Article III standing. But you're claiming economic injury. You're not relying on any other form of standing here, correct? That's correct. We are, and we must, in order to have UCL standing, which I would submit automatically gives us Article III standing. And the ritual slaughter that has been referred to, that's in the Health and Safety Code, that's a particular type of slaughter, kosher or halal slaughter. It is a business practice. And the fact that there's a quid pro quo payment here, this isn't just a general donation that's made. This is a payment with the expectation of something in return. That's what makes it a business. How is it different from buying candles in a church to light? Because in a church, you, well, if that's a specific transaction, then that would be a business practice, Your Honor, because you would be, for purposes of. So if I go into church, and there's a little church on the side that says, I want to light a candle for someone, and I pay $5 for the candle, I'm engaged in a business, that's a business practice with the church. That would be a business practice with the church if the candles had, say, lead in it or something toxic, and a UCL claim was brought, that would be a perfectly valid claim. The church would not be allowed, just because they're a religious institution, to sell. I don't get what I'm praying for. That's not the harm, though, right? What you're praying for, that's not the harm. That's correct, Your Honor. Any other questions, Judge Gould? None here. Thank you. Thank you. Appreciate very much your presentations here today. Mr. Pease and Mr. Martins, thank you very much. The case of United Poultry Concerns versus Shabbat Irvine is submitted.
judges: Gould, Murguia, Amon